**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-16-0000386**
**04-FEB-2019**
**08:36 AM**

NO. CAAP-16-0000386

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI‘I


STATE OF HAWAI‘I, Plaintiff-Appellee,
v.
CARI SALAVEA also known as CARI CARVEIRO,
Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 15-1-0608)

MEMORANDUM OPINION
(By: Ginoza, Chief Judge, Reifurth and Hiraoka, JJ.)

Defendant-Appellant Cari Salavea (**Salavea**) appeals from the Amended Judgment of Conviction and Sentence (**Judgment**) entered by the Circuit Court of the First Circuit (**Circuit Court**)[1] on April 19, 2016. She raises three points of error:

    1.    ineffective assistance of counsel;

    2.    prosecutorial misconduct; and

    3.    insufficiency of evidence to support a conviction.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised, as well as the relevant statutory and case law, we affirm the Judgment.

## I.

Salavea was charged with Burglary in the First Degree in violation of Section 708-810(1)(c) (2014) of the Hawaii

---

[1] The Honorable Karen S.S. Ahn presided.

Revised Statutes (**HRS**).[2]  The offense allegedly occurred on March 27, 2015.  The evidence presented at trial was that the complaining witness (**CW**) lived in unit 4508 of the Moana Pacific condominium's east tower.  It was a secured building with video surveillance cameras at the entrance and in the elevators.  A fob[3] must be scanned to enter the building and to operate the elevators.  When a fob is used, a computer system records the date, time, location, and person to whom the fob is registered.  CW lost her fob in June, 2014.  She purchased a replacement fob.  Moana Pacific's records, in evidence at the trial, show that CW purchased the replacement fob on June 27, 2014.  Moana Pacific's security records show that between 1:33 p.m. and 1:37 p.m.[4] on March 27, 2015, a fob registered to unit 4508 was used to take an elevator from the lobby to the 43rd floor, from the 43rd floor to the 45th floor, and from the 45th floor to the lobby.  There were no other uses of that fob during the month of March, 2015.

CW testified that Salavea was a friend.  CW had last seen Salavea on March 6, 2015, when they had gone gambling.  CW won some money and gave "a little bit" to Salavea.  Salavea "wanted more than just a little bit, . . . she wanted . . . half of my winnings."  CW did not want to give Salavea half of her winnings.  Some time after March 6 but before March 27, Salavea called CW to ask for money but CW refused.

---

[2]  HRS § 708-810 provides, in relevant part:

(1)  A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:

. . . .

(c)  The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

[3]  A fob is a small, gray, teardrop-shaped electronic device.  It does not bear any marks identifying it with the Moana Pacific Condominium.

[4]  The custodial witness testified that the times shown on State's Exhibit 9 were eight minutes earlier than the actual time due to an error in the computer system clock.  The times mentioned in this opinion are the corrected times.

On March 27, 2015, CW was home recovering from a foot injury she sustained at work.  Salavea called CW's phone (a Samsung Galaxy 5) but CW did not answer.  Just before 1:30 p.m. Salavea sent CW a text with the word "bitch."  After receiving the text from Salavea, CW placed her phone next to her bed and went to sleep.  When she woke, her phone was gone.  Her Samsung Galaxy tablet and blue Roxy backpack containing her wallet, bank card, work keys, driver's license and work identification were also missing.  She went downstairs to the security office and asked to see the video surveillance.  She recognized Salavea in the video footage.  Salavea was shown entering the lobby from the loading dock area.  Salavea was shown in the elevator.  Salavea had CW's blue Roxy backpack on her back.  CW never recovered any of her items.  She never gave Salavea permission to enter her condominium unit, or to take her phone, backpack or other personal property.

Salavea testified at the trial.  On direct examination by her attorney, Salavea said she went gambling with CW on March 6, 2015.  CW left her keychain with her fob and front door key in the console of Salavea's car.  CW called Salavea after Salavea dropped CW off, but Salavea was already on the freeway.  Salavea told CW she would return her keys the next time she was in town.  On March 27, 2015, Salavea called CW at noon about returning CW's key and fob.  CW told her to park and come upstairs.  When Salavea was downstairs she called CW to ask if her friend could use the bathroom, but CW did not answer so Salavea texted "bitch" to CW.  The friend remained downstairs and Salavea went upstairs by herself, using CW's fob.  She went to CW's unit and talked with CW.  She returned CW's keys.  She borrowed CW's slippers and Roxy backpack.  She left the Moana Pacific and went to Popeye's so her friend could use the bathroom.

On cross-examination Salavea testified:

> Q.     When you used the fob, you knew it was [CW's] fob, right?
>
> A.     Yes.
>
> Q.     And you went into her building, and some doors

were propped open so you didn't have to use it for the initial entry, correct?

A.      Yes.

Q.      And then you only needed to use it in the elevator to go to her floor?

A.      Yes.

Q.      And then why did you go to the 43rd floor first?

A.      Because I was on my phone, and I got off on the wrong floor.

Q.      So you got off on the 43rd floor first, and then you reused the fob again to get to her floor?

A.      Yes.

Q.      And that was [the] 45th floor?

A.      Yes.

Q.      And you saw the fob records.  You only spent about ten minutes inside of her apartment, correct?

A.      Yes.

Q.      And then you used the fob to go down?

A.      Yes.

The jury found Salavea guilty as charged.


## II.

Salavea raises three points of error:
1.    ineffective assistance of counsel;
2.    prosecutorial misconduct; and
3.    insufficiency of evidence to support a conviction.

1.    Ineffective Assistance of Counsel

A.    Standard of Review

When reviewing a claim of ineffective assistance of counsel, an appellate court looks at whether defense counsel's assistance was within the range of competence demanded of attorneys in criminal cases. State v. DeLeon, 131 Hawai'i 463, 478, 319 P.3d 382, 397 (2014).  The defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: (1) there were specific errors or

4

omissions reflecting counsel's lack of skill, judgment, or diligence; and (2) such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. Id. at 478-79, 319 P.3d at 397-98.

B.    Analysis

General claims of ineffectiveness are insufficient to satisfy the first part of the test. DeLeon, 131 Hawai'i at 479, 319 P.3d at 398. Specific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny. Id. "[M]atters presumably within the judgment of counsel, like trial strategy, will rarely be second-guessed by judicial hindsight." Id. (internal quotation marks and emphasis omitted) (quoting State v. Richie, 88 Hawai'i 19, 39-40, 960 P.2d 1227, 1247-48 (1998)).

Salavea argues that her defense counsel failed to establish that the CW was using illegal drugs at the time of the alleged crime. That, she contends, would have been admissible to impeach CW's memory, perception or state of mind. See, e.g., State v. Calara, 132 Hawai'i 391, 402, 322 P.3d 931, 942 (2014) ("a defendant is entitled to cross-examine a witness concerning the witness's 'drug use and addiction at or near the time of the incident to the extent that it affected [the witness's] perception or recollection of the alleged event.'" (brackets in original and ellipses omitted) (quoting State v. Sabog, 108 Hawai'i 102, 111, 117 P.3d 834, 843 (2005))). Indeed, on June 22, 2015, Salavea's original counsel[5] had filed a notice of "intention to use as evidence at trial that [CW] was in the process of using methamphetamine [at the time of the alleged burglary] in her apartment."

Defense counsel's failure to establish CW's alleged drug use at trial appears to have been a tactical judgment to

---

[5]    Salavea was originally represented by the Office of the Public Defender (**OPD**). OPD moved to withdraw because of a conflict of interest – OPD was representing CW in another criminal matter. Private counsel was appointed on August 27, 2015.

avoid opening the door to presentation of evidence of Salavea's own drug use. In response to Salavea's notice of intention, the State filed a Notice of Intent to Use Evidence of Other Acts. The State identified "Defendant's drug use in 2014 and 2015" as being "admissible as probative evidence to explain why [CW], who is on HOPE probation, did not want to answer defendant's phone calls and hang out with defendant who uses drugs while with [CW], which in turn made defendant upset with [CW's] coolness toward her and provided a motive for the current crime." The State moved in limine to preclude Salavea from proffering evidence of CW's drug use, contending:

> The complainant and the defendant in this case has [sic] met at a drug rehabilitation program, has [sic] been friends for about 6 years and used drugs together. They are both currently on probation. If the defendant is allowed to ask [CW] about [CW's] history of drug use, defendant will be opening the door for the explanation by [CW] that one of the reasons she distanced herself from defendant which in turn made defendant upset and provided a motive for the current offense, was that [CW] felt she was at risk of relapsing while in defendant's company, based on defendant's own drug use.

Salavea moved in limine to preclude the State from proffering evidence about Salavea's drug use. During the hearing on motions in limine, the Circuit Court stated:

> THE COURT: Okay. Use of drugs by anybody, whether it be the Defendant or any witness, other witness, I think is legitimate under the case law because it goes to your ability to perceive and recall. It's up to the jury to decide whether there was an effect or not. So that's going to come in, but it's also a two-way [sic] sword, right?
>
> . . . .
>
> [Deputy Prosecuting Attorney]: Judge, I'd also like to point out -- I think I -- there's a portion of why I filed Notice of Intent. If it does come out and it's pretty much irreparable and the jury here hears Defendant's testimony about any kind of allegations of prior drug use or whatever that goes beyond the scope of that event, State should be allowed to question Defendant and bring it up that they were doing it together over that period of time.
>
> THE COURT: Oh, yeah, it's fair Cross. Both of you have a right to fair Cross, and credibility is always, obviously, an issue in addition to what happened that night or that day.
>
> . . . .
>
> THE COURT: Okay. Defendant's drug use in 2014 and 2015, is that something you still want at this point?

[Deputy Prosecuting Attorney]:  Well, yes.  If they open the door through bringing up the whole history and everything else, then it will go to -- it will go as follows.  The relevance is this.  CW was trying to get away from Defendant because she didn't want to gamble anymore, she didn't want to be in jeopardy with her Hope Probation because every time they met, she ended up using, so if Defense brings up the history of drug use and all of that, then State will be, in my position, entitled to expand on that and have basically an explanation why Complainant did not want to have anything to do with the Defendant anymore because it was screwing up her Hope Probation.

THE COURT:  Okay.  So in other words, if it becomes relevant.

[Deputy Prosecuting Attorney]:  Yeah.

THE COURT:  Okay, so [Motion in Limine No.] 2 is on hold.

. . . .

[THE COURT]:  . . . Have we exhausted the [Hawaii Rules of Evidence Rule] 404 matters on the part of Defendant?

Gambling has been not objected to.

Drug use if the door is opened.

Defense counsel's decision to avoid opening the door to evidence about Salavea's own drug use was a tactical decision that will not be subject to further scrutiny or second-guessed by judicial hindsight.  DeLeon, 131 Hawai'i at 479, 319 P.3d at 398;  Richie, 88 Hawai'i at 39-40, 960 P.2d at 1247-48.  We need not discuss the second part of the test because the elements of the two-part test for establishing ineffectiveness of counsel are inclusive, not independent.

## 2.    Prosecutorial Misconduct

### A.    Standard of Review

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction."  State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (citation and internal quotation marks omitted).

B.    Analysis

In evaluating whether alleged prosecutorial misconduct amounts to harmful error, an appellate court considers: "(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant." Rogan, 91 Hawaiʻi at 412, 984 P.2d at 1238. Misconduct requires vacating a conviction when, in light of these factors, "there is a reasonable possibility that the error complained of might have contributed to the conviction." Id. (citations and internal quotation marks omitted).

Salavea claims that the Deputy Prosecuting Attorney (**DPA**) committed misconduct by: **(1)** offering her personal opinion that CW had told the truth and was "credible" and that Salavea had lied; **(2)** suggesting that Salavea had the burden of proving that CW was lying; **(3)** suggesting that Salavea had lied simply because she was the defendant and had "a lot of interest what's at stake;" and **(4)** personally attacking and accusing defense counsel of misconduct.

**(1)**    Salavea cites the following statements from the DPA's closing argument as offering the DPA's personal opinion that CW told the truth and Salavea had lied:[6]

> [DPA]:  . . . [CW] told you the truth.  [CW's] testimony was credible.
>
> THE COURT:  Well, the State submits.
>
> [DPA]:  Thank you.
>
> The State submits that [CW's] testimony is credible because it is corroborated by other evidence, because it makes sense, and because you, as the judges of everybody's demeanor and looking at those factors that are given to you in the jury instructions, can assess for yourself whether it makes sense or not.
>
> Now, Defendant's testimony, on the other hand, State submits to you, is not credible, and why it's not credible? Because it doesn't make sense.  When Defendant realized that [CW] was not going to give her the money voluntarily, Defendant used an opportunity of having [CW's] fob to go into [CW's] home and steal and take it on her own and

---

[6]    Salavea's Opening Brief incorrectly describes the DPA's closing and rebuttal arguments by omitting ellipses and otherwise failing to indicate that what is purported to be the DPA's closing argument is actually excerpts from it.  The material portions of the DPA's closing argument are set forth in this order.

basically to help herself. When [CW] would not give her money voluntarily and refused to give her money, Defendant was upset. She used the fob, she used the opportunity, the chance that she had, to help herself.

Defendant's story that she had permission to go in and she had somehow thought it was okay and that [CW] cooperated with her and [CW] let her do all of that is not credible. It's not credible, it's a lie, because it doesn't make any sense. Defendant had a motive to go and commit a burglary, to burglarize [CW's] home to take the money, and it was two-fold. On the one hand, she needed the money. On the other hand, you heard about all the dynamics and all the background relationship. Her pride was hurt. She did not like the fact that [CW] was not responding to her phone call. She was upset. In addition to that, she did have [CW's] fob.

What's really significant here -- and this is what you need to focus on and this is how the State submits to you that it's proven that Defendant's story doesn't add up -- is the whole story by Defendant that the fob was lost by [CW] on March 6th does not hold, does not hold up. That's a lie, and from there, it follows that she was concealing the fob, she was deliberately holding on to that fob secretly so she could go in her own time at her own convenience and take from [CW].

[CW] told you and she was very frank with you, she explained in details what happened to her fob. She told you she lost that fob as far as almost a year prior to this incident in March, and that testimony was corroborated by Ray Pavao. That testimony was corroborated by the records that she got an additional fob, she got the second fob.

And what's significant, that fob was only used once -- well, three times, but, like, at one incident at 1:23 -- you'll have your exhibit -- 1:25, and then 1:29, which is exactly corresponds to when Defendant went up to the 43rd floor, went up to the 45th floor, and went down. That was the fob that [CW] was not using because Defendant was in possession of it.

What does that mean? That shows you that [CW] told you the truth. She told you she lost the fob and she got one on June 27th. The records show that she got her replacement fob on June 27th. That directly contradicts Defendant's story that [CW] lost it in the car, and from there, everything crumbles, everything the Defendant tells you is not true.

(emphasis added). Salavea also cites the following statements from the DPA's rebuttal argument as offering the DPA's personal opinion that CW told the truth and Salavea had lied:

[DPA]: . . . You heard the testimony of [CW's] parents. You heard the testimony of [CW]. This was a violation of their privacy, this was a violation of their home, and this was the incident where Defendant took stuff from [CW] without [CW's] permission and where she entered her home using her own - [CW's] fob, without [CW's] knowing, and violating [CW's] right and safety of being in her home and having her property intact. This is not a playful act.

Now, if you look at who is more likely to cook up a story, that was a good suggestion, and State submits to you that one of the guiding, <u>multiple guiding factors are on page 8 of your jury instructions</u>[7] where Judge Ahn did read to you the <u>multiple factors that you may consider in determining whether a person is telling the truth or not</u>.

One of them is the witness' manner of testifying. That is significant.  You saw how [CW] testified.  I don't know if calling her sophisticated is kind of an overstatement.  That's your judgment entirely.  She may not have looked as sophisticated as [defense counsel] is claiming, but she was very forthright, she was very forthright about how she felt.

And she also told you frankly that they were close friends.  She was disappointed with how their relationship went, but she also did express no bias or no reason or no negativity towards Defendant even though I asked her hard questions.  I was kind of asking her, you know, like, how did you feel, what was your, you know, what was your feeling towards relapsing, gambling every time you met with Defendant.  She was very, she was very mild as far as when –

THE COURT:  <u>The State submits.  The State submits.</u>

[DPA]:  State submits her testimony was not in any way showing any animosity.  If anything, she felt betrayed and disappointed.  She had nothing against [Defendant].  Even after this incident, she did not – she has no claim that there was some kind of reason for her to feel specific animosity towards her friend.

She was also very frank and forthright how she described what happened to her when she discovered things were missing.  She told you in details how she was trying to

---

[7] The Circuit Court gave the following instruction to the jury:

It is your exclusive right to determine whether and to what extent a witness should be believed and to give weight to his or her testimony accordingly.  In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor; the witness's manner of testifying; the witness's intelligence; the witness's candor or frankness, or lack thereof; the witness's interest, if any, in the result of this case; the witness's relation, if any, to a party; the witness's temper, feeling, or bias, if any has been shown; the witness's means and opportunity of acquiring information; the probability or improbability of the witness's testimony; the extent to which the witness is supported or contradicted by other evidence; the extent to which the witness has made contradictory statements, whether in trial or at other times; and all other circumstances surrounding the witness and bearing upon his or her credibility.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony.  In weighing the effect of inconsistencies or discrepancies, whether they occur within one witness's testimony or as between different witnesses, consider whether they concern matters of importance or only matters of unimportant detail, and whether they result from innocent error or deliberate falsehood.

call her phone, and it went to ringing first, then voicemail. It took her a while to figure it out. Then she went downstairs and she started checking the video. If it happened the way Defendant is telling you it happened and they actually had these conversations and [CW] invited her to go up, why would [CW] go down and bother Ray Pavao to review the video and check who was it that came?

And Ray Pavao is absolutely impartial witness. You heard his testimony. [Defense counsel] was asking him all these questions, whether he discussed it with someone else, whether he knew other people, and he told you he had no clue. He was just doing his job, and he saw this tenant who came down and told him that things were stolen from her and she wanted to see the video to figure it out who that was. She did have her suspicion because the last person who called her was Defendant. But why would she go to Ray and look at that video to try to figure it out if in fact it happened the way [Defendant] says it happened? [Defendant] is not a truthful witness.

Another factor is interest, if any, in the result of this case. Of course, every Defendant has a lot of interest in the result of the case, and that's natural, but you cannot disregard it. It's still there. There is interest and bias. Defendant has a lot of interest what's at stake, while [CW], why would [CW] go through all of this and why would [CW] go and make up a story if it was not what happened? There was no evidence by Defendant why is it that [CW] would do it, and there was no evidence from [CW], even though we pushed her, both of us, that she had any reason to tell this story. She told you the truth.

THE COURT: Well, the State submits.

[DPA]: State submits she told you the truth.

THE COURT: Strike that "She told you the truth."

What is your argument?

Jury will disregard that part of the argument.

[DPA]: Okay.

Now, another factor is the extent to which a witness is supported or contradicted by the evidence, and that's another factor.[8] When you see the evidence of Defendant texting [CW], asking for money, admitting before then that they had this kind of falling out, they were pulling apart, texting her "bitch" just before going up to her or, like, sometimes before going up to her house, stealing a bag from her, admittedly, using the fob on her own, that is evidence that is on the video, and that tells you something. It's basically plain evidence that tells you she was using the fob, [CW] was not giving her permission.

---

[8] The Circuit Court gave the following instruction to the jury:

If you find that a witness has deliberately testified falsely to any important fact or deliberately exaggerated or suppressed any important fact, then you may reject the testimony of that witness except for those parts which you nevertheless believe to be true.

> Now, the extent to which witness has made contradictory statements. She testified, and you could tell -- you heard how she was minimizing at first. She was trying to tell you it was okay we're exchanging things and we take each other's stuff, and then at the end, she changed her position and basically admitted that, yeah, she stole the bag. Why did she do that? Why did she do that? Because she's trying to convince you of something that did not happen. She's trying to minimize what she did.
>
> State submits to you the evidence that you heard and specifically the fact that after [CW] was not going to give her money voluntarily and because she was in possession of that fob, taken in conjunction, that fob was purchased a year ago, the replacement fob was purchased a year ago, that shows [CW] lost it long time ago, not on March 6th, and it shows you the Defendant was concealing that fob, going in with a criminal intent, means that she's guilty and that State has proven she's guilty beyond a reasonable doubt of Burglary in the First Degree, and State will ask you to deliver that verdict.

(emphasis and footnote added).

We initially note that Salavea did not object at trial to the foregoing portions of the DPA's closing or rebuttal arguments. Nevertheless, under the plain error doctrine, "where plain error has been committed and substantial rights have been affected thereby, the error may be noticed even though it was not brought to the attention of the trial court." State v. Miller, 122 Hawaiʻi 92, 100, 223 P.3d 157, 165 (2010) (citations omitted). The Hawaiʻi Supreme Court has held that it "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." Id. (citations, internal quotation marks and emphasis omitted). Therefore, despite Salavea's failure to raise the issue below, the alleged error may be corrected on appeal unless it was harmless beyond a reasonable doubt. Id.

Applying the Rogan factors, we conclude that the DPA's closing and rebuttal arguments, taken as a whole, did not constitute prosecutorial misconduct. Disposition of the case below depended upon whether the jury believed the testimony of CW or that of Salavea. In characterizing CW's testimony as the truth and Salavea's testimony as a "lie," the DPA described at length and in detail how the evidence adduced at trial made CW's testimony more credible than that of Salavea. The Circuit Court

gave numerous prompt curative instructions ("the State submits"), struck the DPA's statement that "She told you the truth" and instructed the jury to "disregard that part of the argument." In addition, the Circuit Court instructed the jury:

> Statements or arguments made by lawyers are not evidence. You should consider their arguments to you, but you are not bound by their memory or interpretation of the evidence.

The DPA's argument was supported by the evidence adduced at trial. We conclude it was not misconduct at the time of the trial in this case for the DPA to use the word "lie."[9]

**(2)** Salavea contends that the DPA improperly suggested that Salavea had the burden of proving that CW was lying when she argued:

> Another factor is interest, if any, in the result of this case. Of course, every Defendant has a lot of interest in the result of the case, and that's natural, but you cannot disregard it. It's still there. There is interest and bias. Defendant has a lot of interest what's at stake, while [CW], why would [CW] go through all of this and why would [CW] go and make up a story if it was not what happened? <u>There was no evidence by Defendant why is it that [CW] would do it</u>, and there was no evidence from [CW], even though we pushed her, both of us, that she had any reason to tell this story. She told you the truth.
>
> THE COURT: Well, the State submits.
>
> [DPA]: State submits she told you the truth.
>
> THE COURT: Strike that "She told you the truth."
>
> What is your argument?
>
> Jury will disregard that part of the argument.

---

[9] Before June 29, 2018, the Hawai'i Supreme Court had never "prohibited prosecutors from arguing in their closing arguments that the defendant 'lied.'" <u>State v. Austin</u>, 143 Hawai'i 18, 43, 422 P.3d 18, 43 (2018) (Nakayama, J. writing separately). In <u>Austin</u>, after discussing the issue, Justice Pollack writing for the court stated:

> "In light of these considerations and the extremely minimal utility the term 'lie' and its derivatives have over more neutral alternatives, we have little trouble determining that the balance of factors weighs in favor of prohibition. Accordingly, we <u>now</u> hold that a prosecutor's assertion that a defendant or witness lied to the jury is improper and should not be permitted."

<u>Id.</u> at 56, 422 P.3d at 56 (emphasis added). Because <u>Austin</u> created a new rule, it "should be given only purely prospective application to avoid substantial prejudice to prosecutions and the courts." <u>Schwartz v. State</u>, 136 Hawai'i 258, 273, 361 P.3d 1161, 1176 (2015) (citation omitted).

(emphasis added). We disagree with Salavea's contention. The DPA was merely arguing that CW's credibility had not been impeached by any evidence of bias or motive to "make up a story." The Circuit Court instructed the jury:

> You must presume the Defendant is innocent of the charge against her. This presumption remains with the Defendant throughout the trial of this case, unless and until the prosecution proves the defendant guilty beyond a reasonable doubt.
>
> . . . .
>
> The defendant has no duty or obligation to call any witnesses or produce any evidence.

We conclude that the DPA did not improperly argue that Salavea had the burden of proving that CW was lying.

(3) Salavea contends that the DPA improperly argued that Salavea had lied simply because she was the defendant in a criminal case, citing State v. Basham, 132 Hawai'i 97, 319 P.3d 1105 (2014). In Basham the State began its closing argument by telling the jury that two complaining witnesses were "completely credible" and had "absolutely no reason to fabricate or otherwise make up the accounts that they have recited to you in explicit detail." Id. at 104, 319 P.3d at 1112. The prosecution then stated that the defendant who testified at trial had

> absolutely no reason to tell you the truth. So the selection or the choice before you in weighing the credibility of the witness[es] is this. Your willingness to believe two people who have no reason to lie to you versus one person who has no reason to tell you the truth.

Id. At that point in the closing argument the prosecutor had not yet discussed any of the testimony presented at trial or offered any reason based on the evidence for why the defendant would have no reason to tell the truth. Id. at 116, 319 P.3d at 1124. The supreme court stated that "the implication of the prosecutor's argument" was that the defendant "had no reason to tell the truth because he was a defendant in the case." Id. at 115-16, 319 P.3d at 1123-24. The court held that

> it is improper for a prosecutor in summation to make generic arguments regarding credibility based solely upon the status of a defendant. Walsh, 125 Hawai'i at 285, 260 P.3d at 364 ("Because fundamental rights are infringed when generic

14

> tailoring arguments are made, generic tailoring arguments
> are subject to plain error review."). Accordingly, a
> prosecutor may not argue during closing argument that
> defendants, because they are defendants, have no reason to
> tell the truth or have the "greatest motive to lie."
> Apilando, 79 Hawai'i at 142, 900 P.2d at 149.

Id. at 118, 319 P.3d at 1126. The supreme court cited to its decisions in State v. Walsh, 125 Hawai'i 271, 260 P.3d 350 (2011) and State v. Apilando, 79 Hawai'i 128, 900 P.2d 135 (1995). Walsh was a "generic tailoring" case.[10] The DPA in this case did not make a generic tailoring argument. In Apilando the supreme court held that it was not improper for the prosecutor to comment that, because the defendant had the highest stake in the outcome of the case, he had the greatest motive to lie. 79 Hawai'i at 142, 900 P.2d at 149. The supreme court's majority opinion in Basham cited Apilando twice, without overruling it.[11] We recently attempted to reconcile this apparent inconsistency in State v. Magbulos, 141 Hawai'i 483, 413 P.3d 387 (App. 2018). After discussing Basham and Apilando, id. at 495-97, 413 P.3d at 399-401, we concluded:

---

[10]
> "A generic tailoring argument occurs when a prosecutor
> states that the defendant was able to sit through the trial
> and hear the testimony of other witnesses, thereby allowing
> the defendant the opportunity to shape his or her testimony
> to fit that of other witnesses, even when there is no
> evidence that defendant has actually done so."

Walsh, 125 Hawai'i at 282, 260 P.3d at 361 (internal quotation marks omitted). Generic tailoring arguments are subject to plain error review because they infringe on the defendant's fundamental rights to confrontation, to a fair trial, to testify on his or her own behalf, and to be present at each criminal proceeding. Id. at 284-85, 260 P.3d at 363-64.

[11]    A "but see" citation to Apilando appears in the Basham majority opinion in the following context:

> It is well-established "under Hawai'i case law that
> prosecutors are bound to refrain from expressing their
> personal views as to a defendant's guilt or the credibility
> of witnesses." [State v. Clark, 83 Hawai'i 289, 304, 926
> P.2d 194, 209 (1996)] (citations omitted). See State v.
> Marsh, 68 Haw. 659, 660, 728 P.2d 1301, 1302 (1986); State
> v. Cordeiro, 99 Hawai'i 390, 424-25, 56 P.3d 692, 726-27
> (2002); [State v. Tuua, 125 Hawai'i 10, 14, 250 P.3d 273,
> 277 (2011)]. But see State v. Apilando, 79 Hawai'i 128,
> 142, 900 P.2d 135, 149 (1995) (prosecutor's comment that
> defendant "had the greatest motive to lie" because he had
> the "highest stake in the outcome of the case" was
> permissible attack on defendant's credibility).

> Basham, 132 Hawai'i at 115, 319 P.3d at 1123.

> Basham should be read narrowly to only preclude the
> prosecutor from making the generic argument regarding the
> defendant's interest in the outcome of the case, and <u>not to
> prevent the jury from considering the defendant's interest
> in the outcome of the case in evaluating his or her
> credibility.</u>[12]  Interpreting Basham in this manner, we
> conclude that the prosecutor's Basham error was harmless and
> did not prejudice Magbulos' right to a fair trial.

Id. at 497, 413 P.3d at 401 (emphasis and footnote added).
Similarly, in this case we conclude that the DPA's argument was
harmless beyond a reasonable doubt and did not prejudice
Salavea's right to a fair trial because, as discussed above, the
DPA also described how the evidence adduced at trial made CW's
testimony more credible than that of Salavea.  We do not believe
the DPA sought to usurp the jury's role to make credibility
determinations.  Since the DPA's argument was supported by the
strength of the evidence adduced at trial, her argument was not
misconduct.

**(4)**  Salavea contends that the DPA personally attacked
and accused defense counsel of trying to manipulate the jury.
Salavea's counsel stated in closing argument:

> If I may leave you with a suggestion of evaluating the
> evidence in this case, it would be this.  You recall that
> just before our lunch break, [Salavea] went on the witness
> stand, and the Deputy Prosecutor asked her whether she
> didn't take the Roxy bag without permission and whether that
> wasn't indeed theft, and [Salavea] broke down, she was in
> tears, and that's, I suggest -
>
> [DPA]:  Objection, Your Honor.  This is not in
> evidence, and it's personal statement.
>
> THE COURT:  Overruled.
>
> [Defense Counsel]:  And that's because it probably
> didn't even occur to her that that playful little act might
> be viewed by the law as a theft.  Now, the Government would
> have you believe that [Salavea], being that type of person,
> would take all of her friend's valuables, and it's just not
> borne out by the evidence.  Something occurred between these
> two women, but it wasn't a burglary.
>
> Thank you.

---

[12]     The Circuit Court gave the following instruction to the jury:

> In evaluating the weight and credibility of a
> witness's testimony, you may consider . . . the
> witness's interest, if any, in the result of this
> case[.]

Then, in rebuttal, the DPA stated:

> Ladies and gentlemen, what Defense Counsel was just doing was trying to appeal to your sense of pity or some kind of sense, you know, for Defendant, and that's improper. You are given an instruction that you should not be influenced by that.

The Circuit Court had instructed the jury: "You must not be influenced by pity for the Defendant or by passion or prejudice against the Defendant." The DPA simply reminded the jury about the Circuit Court's instruction in response to what could reasonably have been interpreted as defense counsel's attempt to have the jury take pity on Salavea. We conclude there was no misconduct.

### 3. Sufficiency of Evidence

#### A. Standard of Review

When reviewing the sufficiency of evidence on appeal, we apply the following deferential standard of review:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Kalaola, 124 Hawai'i 43, 49, 237 P.3d 1109, 1115 (2010) (citations omitted). "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (citation omitted).

#### B. Analysis

Salavea contends there was no substantial evidence she entered CW's apartment unlawfully, or that she entered CW's apartment with intent to commit therein a crime against a person or against property rights. The evidence adduced at trial, considered in the strongest light for the prosecution, was substantial enough to support the jury's verdict. The evidence

17

showed that the fob used by Salavea to gain access to CW's condominium unit on March 27, 2015 had been misplaced by CW in June of 2014 - not on March 6, 2015, as stated by Salavea - because CW purchased a replacement fob on June 27, 2014.  There was no evidence to establish what happened to the lost fob between June 27, 2014 and March 27, 2015, but Salavea admitted using the lost fob on March 27, 2015, after CW had refused to give Salavea more of CW's gambling winnings.  On that date, Salavea called CW's mobile phone but CW did not answer.  Salavea texted "bitch" to CW's phone.  CW did not respond.  The jury could have inferred that Salavea did this to try to determine whether CW was home.  The jury could then have inferred that at 1:33 p.m., with the intent to commit a crime against CW's property rights, Salavea used CW's lost fob to take the Moana Pacific elevator to CW's unit on the 45th floor.  Salavea admittedly took CW's Roxy backpack without CW's consent.  Salavea did not return the fob, as she stated was her intent, but used it to take the elevator from the 45th floor to the lobby, carrying CW's Roxy backpack on her back.  Salavea then went to Popeye's.  She admitted to never returning CW's property.  Based on the foregoing, we conclude that the jury was presented with substantial evidence as to every material element of burglary in the first degree, of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion that Salavea was guilty of that offense.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## III.

Based on the foregoing, the Amended Judgment of Conviction and Sentence of the Circuit Court of the First Circuit entered on April 19, 2016, is affirmed.

DATED:  Honolulu, Hawai'i, February 4, 2019.

On the briefs:

Randall K. Hironaka,
(Miyoshi & Hironaka, LLLC)
for Defendant-Appellant

Sonja P. McCullen,
Deputy Prosecuting Attorney,
City and County of Honolulu
for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge

19